Theodore W. **WEYHMUELLER,**
**Plaintiff,**

v.

**JANITORS UNION LOCAL NO. 1, SERVICE EMPLOYEES INTERNATIONAL UNION, Defendant.**

No. 79 C 2297.

United States District Court,
N. D. Illinois, E. D.

March 9, 1981.

---

John M. Bowlus and Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiff.

Kalman D. Resnick, Martin J. Burns, Linda R. Hirshman, and Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, Senior District Judge.

In this case, the plaintiff, a member and former appointed official of the defendant, alleges that he was discharged from his position as business agent because he ran against the incumbent president in an election held shortly before his dismissal. The plaintiff claims that his discharge under these circumstances violated section 609 of the Labor Management Reporting and Disclosure Act (LMRDA). The defendant now moves for summary judgment. For the reasons stated below, we deny the motion.

## BACKGROUND

The facts in this case, with a few crucial exceptions, are undisputed. The plaintiff has been a member in good standing of the defendant union since 1953. From 1953 to 1960, plaintiff worked as a janitor in the Chicago area. In 1960, he was appointed a business agent. He served in this capacity until October 4, 1978.

As business agent of one of eight districts within the defendant's jurisdiction, the plaintiff occupied a position of responsibility and authority and exercised considerable discretion.[1] A business agent is expected to supervise all union employees within his district, investigate and attempt to settle

informally employers' complaints regarding union members' job performance, assist in the processing of grievances, supervise the collection of members' dues and employers' contributions to the health and welfare fund, supervise and engage in organizing efforts within the district, investigate employers' compliance with the collective bargaining agreement, refer union members for employment to employers with whom the union has a collective bargaining agreement, and explain and generate support for the union's policies and positions on various issues among the membership.

In May 1978, the plaintiff announced that he intended to run for president in the next election against the incumbent, Charles Burg. Mr. Burg and other officials of the local union and its international affiliate apparently were displeased by plaintiff's candidacy. In June 1978, the plaintiff met briefly with Mr. Burg and Eugene Moats, the vice president of the international union, to discuss the upcoming election. Mr. Moats informed the plaintiff that, in Mr. Moats' opinion, the plaintiff stood no chance of winning the presidency, was not qualified for the job, and would harm the union by dividing the membership if he continued to run for the position. Mr. Moats also told the plaintiff, in an allegedly threatening tone, that he "[didn't] think everyone can shake hands and walk away from it when its over." He reminded the plaintiff that he was an appointed, rather than elected, official and that he served at the pleasure of the elected officials. Mr. Moats continued, "[a] lot of people would like your job. There are a hundred guys out there swinging a mop and broom for every business agent in Local 1 . . . and they'd love to be in your job tomorrow."

Despite Mr. Moats' and others' disapproval of his candidacy, the plaintiff continued campaigning for president of the union. However, on September 14, 1978, he lost the election to Mr. Burg.

---

1. Although the plaintiff "doubt[s] very much" that a business agent enjoys significant discretion in his performance of these functions, he has presented no evidence to support his view.

Consequently, we accept the defendant's characterization of a business agent's responsibilities and authority.

What occurred thereafter is in dispute. According to the defendant, the relationship between Mr. Burg and the plaintiff was cordial following the election. On September 29, 1978, however, a union member named Slobodan Ilic allegedly came to the defendant's offices and charged the plaintiff with having taken money in exchange for the plaintiff's referring him to a new job. Accepting money for referring a member for employment was contrary to union policy. And, according to the defendant, business agents were frequently warned not to engage in such a practice. The defendant allegedly interviewed Mr. Ilic at length about the incident and concluded that the charges were true. On October 4, 1978, Mr. Burg and other union officials informed the plaintiff that he was summarily fired for "selling jobs."

According to the plaintiff, however, Mr. Ilic's charges were unfounded or exaggerated, and the defendant simply seized on them as a convenient excuse for discharging him. The real reason for his discharge, according to the plaintiff, is that he opposed Mr. Burg for the union's presidency. The plaintiff points to the summary way in which he was dismissed, despite his denial of Mr. Ilic's charges, as evidence that the defendant's stated reason for dismissing him was a pretext. Mr. Moats' "threats" prior to the election, together with the fact that the plaintiff's discharge occurred less than a month after the election and without any hearing, plaintiff asserts, indicate the real reason for his firing.

Although the plaintiff retains his membership in the defendant union, he has not held an elected or appointed post since his dismissal as business agent. In June 1979, he initiated this action, claiming that he was unlawfully disciplined by the defendant for exercising his rights under sections 101(a)(1) and (2) of the LMRDA.

## DISCUSSION

Section 101(a)(1) and (2) of the LMRDA, 29 U.S.C. §§ 411(a)(1) and (2), provide in relevant part:

*Equal rights*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, . . . .

*Freedom of speech and assembly*—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings. . . .

Additionally, section 609 of the Act, 29 U.S.C. § 529, provides in part:

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.

There is no dispute in the present case that the plaintiff's active candidacy against the incumbent president of the union and his criticism throughout the campaign of the incumbent leadership's policies are rights protected by sections 101(a)(1) and (2). The primary issue here is whether the union's discharge of the plaintiff for exercising these rights is actionable under section 609.

A number of courts have recently addressed the question whether a union member can challenge his removal from an appointed position, and have reached different conclusions. Several courts have concluded that an appointed official may be removed from office for any reason or no reason, including for exercising his rights under section 101(a). *See, e. g., Wambles v. International Brotherhood of Teamsters,* 488

F.2d 888, 889–90 (5th Cir. 1974) (per curiam); *Cehaich v. International Union, UAW*, 496 F.Supp. 912, 916 (E.D.Mich. 1980); *Navarro v. Leu*, 469 F.Supp. 832, 835 (N.D.Ohio 1979). *See also Wood v. Dennis*, 489 F.2d 849, 858 (7th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974) (Stevens, J., concurring). These courts point out that elected union officials necessarily rely on appointed officials to implement their policies and plans and, therefore, need the full cooperation and support of these appointed officials. Unless elected officials are free to choose the people who will be carrying out their directives, their plans may not be fully implemented and, indeed, may be frustrated; to be able to choose those who will be carrying out their plans, elected officials must have a free hand to hire—and fire—appointed officials. *See Wambles v. International Brotherhood of Teamsters, supra* at 889–90; *Cehaich v. International Union, UAW, supra* at 915. Moreover, these courts have concluded that union officials need not wait for evidence of insubordination before discharging appointed officials. As one court has explained,

> It can be argued that an appointed office holder under the president who has opposed him in the election does not guarantee obstructionist policies while he serves in his position as an appointed Union official and that before the appointed official could be discharged for cause he would have to show an actual conflict of interest. This is a rather charitable view of persons recently involved in political conflict. A more realistic view would be that in a great majority of cases the friction generated in the election campaign would infect and seriously impede the successful candidate's implementation of his program approved by the membership electing him.

*Wambles v. International Brotherhood of Teamsters, supra* at 889. *See also Cehaich v. International Union, UAW, supra* at 916; *Navarro v. Leu, supra* at 835.[2]

At the heart of these courts' conclusion that an appointed union official can be discharged for exercising his rights under section 101(a) is their belief that Congress did not intend in the LMRDA to interfere with the conduct of internal union affairs beyond guaranteeing certain minimum democratic rights for union members. To attempt to distinguish between the firing of union officials for dissent and firing for insubordination, according to these courts, would intrude more deeply into internal union affairs than Congress intended. *See Wambles v. International Brotherhood of Teamsters, supra* at 890. *See also Wood v. Dennis, supra* at 858 (Stevens, J., concurring). Also central to these courts' conclusion is their conviction that to restrict in any way elected officials' hiring and firing of appointed officials would actually decrease, rather than increase, union democracy. As one court has stated,

> To extend the protection of labor's "Bill of Rights," ... to such office holders would, in effect, give such officers a lifetime job except on dismissal for cause. The elected officials necessarily rely on appointed officials to implement policies and plans presumably approved by the Union membership in the election. To tie the President's hands, an elected official, by not allowing him to discharge without cause or for any reason those who must serve under him would so restrict the elected officers in the discharge of their duties that elections could be meaningless. An appointed official should carry out the approved policies of the Union. His convictions and loyalties should be to the Union and not a personal fiefdom beyond the reach of the membership, here expressed by the appointive powers of elected officers.

*Wambles v. International Brotherhood of Teamsters, supra* at 889–90. *See also Cehaich v. International Union, UAW, supra* at 915.

---

**2.** Although *Wambles* has been limited to its facts, *see Rosser v. Laborers' International Union of North America, Local No. 438*, 616 F.2d 221, 222 n. 1 (5th Cir. 1980); *Miller v. Holden*, 535 F.2d 912, 916 (5th Cir. 1976), we have discussed the opinion at length because a number of courts have relied heavily, and continue to rely, on it.

In a second group of cases, several courts that have addressed the question whether a union member can challenge his removal from an appointed position, where his removal was allegedly occasioned by the exercise of his rights under section 101(a), have reached a different result. These courts have concluded that, while an appointed official cannot be discharged simply for exercising his section 101(a) rights, he may be discharged for insubordination; however, these courts have defined insubordination broadly enough to encompass activities which arguably are protected by section 101(a). *See, e. g., Miller v. Holden*, 535 F.2d 912, 916 (5th Cir. 1976); *Sewell v. Grand Lodge of the International Association of Machinists and Aerospace Workers*, 445 F.2d 545, 550–51 (5th Cir. 1971), *cert. denied*, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972). These courts agree with *Wambles, Cehaich*, etc., that elected union officials necessarily rely on appointed officials to carry out their policies and programs. They also agree that elected union officials have the right to expect loyalty and cooperation from the appointed officials. Consequently, these courts have concluded that an appointed union official who "spend[s] his employer's time opposing the plans and policies he was employed to execute" can be discharged even though, as a union member, the official has a right to express his dissatisfaction with union policies and programs. *Sewell v. Grand Lodge of the International Association of Machinists and Aerospace Workers, supra* at 551. Thus, in *Sewell*, the court held that the dismissal of an appointed union representative because of his active opposition to a referendum proposal that the union's elected leadership supported was entirely proper. *See id.* at 552.

At the same time, however, these courts, unlike *Wambles, Cehaich*, etc., apparently believe that a distinction should be drawn between the firing of union officials for dissent and firing for insubordination. *See Miller v. Holden, supra* at 916; *Sewell v. Grand Lodge of the International Association of Machinists and Aerospace Workers, supra* at 550–51. Moreover, they, unlike

the courts in *Wambles, Cehaich*, etc., apparently do not condone the dismissal of appointed union officials before any evidence of insubordination surfaces. *See Miller v. Holden, supra* at 916.

In a third group of cases, courts have concluded that a union member can challenge his discharge under the LMRDA. *See, e. g., Grand Lodge of the International Association of Machinists v. King*, 335 F.2d 340, 346 (9th Cir. 1964), *cert. denied*, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964); *DeCampli v. Greeley*, 293 F.Supp. 746, 752 (D.N.J.1968); *George v. Bricklayers, Masons, and Plasterers International Union of America*, 255 F.Supp. 239, 242 (E.D.Wis.1966). These courts have concluded that, although partisan participation by appointed officials in intra-union politics may threaten the smooth internal administration of unions, Congress intended to extend the rights set out in section 101(a) to all union members and not simply to rank and file, non-office holding members. As one court has explained,

It would seem, in protecting the exercise of democratic rights of free speech and assembly at union meetings involving matters bearing on the affairs of the full membership, that union officers and important officials, such as Business Agents, have a greater obligation to speak up than do the ordinary members, because of the responsibility and prestige of their positions. A Business Agent is just such a union official to whom the membership looks for guidance, .... It is widely known that in many unions the Business Agent is the most important administrative representative. To reduce him to silence through fear of disciplinary reprisal is tantamount to saying that the member who succeeds in becoming an official of the union forfeits membership rights guaranteed to him by the LMRDA. Certainly, Congress never contemplated the imposition of such a "Hobson's Choice."

*DeCampli v. Greeley, supra* at 752. These courts, it seems, are likely to scrutinize more carefully than would the courts in

*Sewell* and *Miller* the reasons for a union official's discharge. Additionally, these courts, unlike those in *Sewell* and *Miller,* do not discuss insubordination, or suggest that an appointed official may be discharged for exercising his section 101(a) rights even if the exercise may rise to the level of insubordination. Nevertheless, the difference between these courts' view and that of the courts in *Sewell* and *Miller* is primarily one of degree—the degree to which they believe dissent among appointed union officials should be tolerated—and not a difference in their views concerning whether an appointed official can state a claim under the LMRDA.

Had the Seventh Circuit taken a position on this issue we would, of course, be bound to follow its lead. But this circuit has not yet addressed the issue whether an appointed union official can challenge his dismissal from office under the LMRDA.

*Wood v. Dennis,* 489 F.2d 849 (7th Cir. 1973) (en banc), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974), is a strong indication of how the Seventh Circuit would rule if it were faced with this question, however. In *Wood,* an *elected* union official challenged his discharge, claiming that he was dismissed for exercising his rights under section 101(a). The court concluded that the official's charge that the union leadership attempted to chill the exercise of his right to free speech and right to stand for office by removing him from office stated a cause of action under the LMRDA. *See id.* at 853. The court, drawing no distinction between the rights of elected and appointed officials,[3] adopted the position set forth in *King, supra. See id.* at 853. The court concluded that there was nothing in the legislative history of the Act indicating that officers forfeited their right under section 101(a) when they assumed office. *See id.* at 854. At the same time, however, the court noted that it was "not unmindful of the fine line which must be drawn between what might be termed

insubordination on the one hand and freedom of speech on the other," and cited *Sewell* as an example of a case in which this distinction was important. *See id.* at 855–56.

We believe, in light of *Wood,* that the Seventh Circuit would hold that an appointed union official can challenge his dismissal from office if he believes it was occasioned by his exercising his rights under section 101(a). At the same time, we believe that the Seventh Circuit would recognize the right of union leadership to discharge an appointed official where his behavior rises to the level of insubordination, interfering with the performance of his official duties. We also believe that this is the preferable approach.

So long as union leadership is free to discharge appointed officials whose activities and attitudes interfere with the performance of their duties, appointed officials need not put up with uncooperative officers or fear that their policies will be frustrated by the individuals upon whom they must rely to implement them. Additionally, under this approach, appointed union officials will not be frozen into their jobs and insulated from attack by a voting membership dissatisfied with their performance, as the courts in *Wambles* and *Cehaich* feared. Elected union leadership will be free to replace inept or uncooperative appointed officials, *provided that their dismissal is not simply in retaliation for their exercise of their section 101(a) rights.*

We recognize, nevertheless, as *Wambles* and *Cehaich* point out, that it may be difficult in many cases to distinguish between discharges intended to eliminate an insubordinate or incompetent officer and discharges in retaliation against an officer's expression of dissent. But, courts are frequently asked to distinguish between employers' discharges of employees for proper and improper reasons—in Title VII cases and cases involving alleged retaliatory discharges in OSHA and Wage and Hour cases, for exam-

---

3. Almost every other court has distinguished between appointed and elected union officials, since a stronger case can be made that elected officials cannot be removed from office for expressing dissenting views.

**998**

ple—so this task is not an unfamiliar one. More importantly, the difficulty involved in distinguishing between simple dissidence and insubordination is worth the effort to preserve the rights which Congress, in the LMRDA, intended all union members to enjoy.

 Turning to the facts of the present case, we conclude that the defendant is not entitled to summary judgment. As our discussion above indicates, we reject the defendant's argument that it was entitled to discharge the plaintiff even if the reason for the discharge was the plaintiff's unsuccessful candidacy against the incumbent president and his outspoken criticism of the incumbent leadership's policies. As our earlier discussion explained, the defendant cannot discharge the plaintiff simply for exercising the rights protected by section 101(a).

If, however, the plaintiff's disagreement with the incumbent leadership's policies and programs had interfered with the performance of his duties as business agent then, of course, the defendant would have been entitled to discharge him for this reason. Although the defendant has charged the plaintiff with having violated an important union policy by "selling jobs," there remain unresolved issues of material fact regarding this charge. The plaintiff has produced evidence of threats, made by the defendant prior to the election, to discharge him if he persisted in running against the incumbent president. These purported threats and the timing of the plaintiff's discharge are circumstantial evidence suggesting that the plaintiff's dismissal was in retaliation for his exercise of his rights under section 101(a) and, therefore, improper under the LMRDA. Moreover, even though the plaintiff admitted in his deposition that he received an unsolicited $200 from Mr. Ilic *after* he referred Mr. Ilic for employment, this is hardly conclusive evidence that the plaintiff violated a union policy against "selling jobs" or that the defendant fired him for "selling jobs."

We therefore deny the defendant's motion for summary judgment.